UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WALTER JOSEPH MEGNA,

                    Plaintiff,

          v.                                          Case No. 24-cv-0588-scd

JOHN MUSIAL et al.,

                    Defendants.

## DECISION AND ORDER DENYING DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

Plaintiff Walter Joseph Megna, who is incarcerated at Kettle Moraine Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Fourth Amendment claims in connection with a traffic stop that resulted in a search of the truck in which he was a passenger, as well as his jacket. On February 13, 2025, Defendants Manitowoc Police Department Captain John Musial and Officer Alexia Zak moved for summary judgment. For the reasons explained below, the Court will deny the motion in part and grant it in part.

## BACKGROUND

On January 10, 2023, the City of Manitowoc Police Department received a tip that a tan Ford Explorer entering Manitowoc was involved in drug trafficking. Apparently unrelatedly, the department also received a tip that the same van had been speeding or driving erratically on I-43. That same night, Captain Musial and Officer Zak were patrolling in Manitowoc in a marked truck. At about 7:47 p.m., Captain Musial initiated a stop on the vehicle in which Megna was a passenger for allegedly violating Wis. Stat. §347.13(3), driving at night without a lamplight illuminating the rear registration plate. According to Megna, almost immediately after Captain Musial turned on his emergency lights, four other squad cars that were also following the vehicle Megna was

traveling in turned on their emergency lights. Neither Captain Musial nor Officer Zak state that they were aware of the drug-trafficking or speeding tips. Dkt. No. 52 at ¶¶1-8.

Once the vehicle stopped, Officer Zak approached the passenger side and from prior contacts identified Lindsey Sukowaty as the driver and Megna as the passenger. Zak instructed Sukowaty and Megna to put their hands in front of them, and another officer (who is not a Defendant) asked Sukowaty to step out of the vehicle. At the same time, Officer Zak spoke with Megna through the passenger-side window. Officer Zak asserts that she noticed a folded-up piece of tinfoil in the back seat, which from her training and experience she suspected could be a "bindle" used to transport, sell, or inhale controlled substances. Officer Zak asked Megna to step out of the vehicle, and he voluntarily did so while holding his jacket. Officers engaged in conversation with Megna about where he was coming from. Megna was agitated by the traffic stop and Officer Zak's questions. Officer Zak asserts that she noticed Megna was acting differently than he had acted during his multiple prior contacts with her. Dkt. No. 52 at ¶¶ 9-27.

Other officers (who are not Defendants) talked with Sukowaty, with one asking her if there were any narcotics in the vehicle. Sukowaty was vague, stating "there shouldn't be" and "I don't know." She initially suggested she would consent to police searching the vehicle, but then said she would rather "go through the game" and have a K-9 walk around the vehicle. Officer Zak then spoke to Sukowaty while Megna stood outside the vehicle with Captain Musial and others. Megna asserts that, while he was talking with officers, he noticed that all the lights on the vehicle were properly working. Officers informed Megna that a complaint had been made that the vehicle was speeding on the interstate. Megna informed officers that the speedometer on the vehicle was broken, but he had an app on his phone that he used to keep track of the speed. He conceded that, while on the highway, the vehicle was traveling 74 m.p.h., four miles over the speed limit. Neither

2

Captain Musial nor Officer Zak state that they were aware of the speeding complaint or observed the vehicle speeding. Dkt. No. 52 at ¶¶8, 32-37, 39-43.

An officer deployed a K-9 unit to conduct a sniff of the vehicle. At about 7:55, less than ten minutes after the vehicle was stopped, a K-9 that was imprinted to detect cocaine, heroin, methamphetamine, and ecstasy narcotic odors was walked around the vehicle three times. On the third pass, the K-9 "hit" on the driver's side window, which was down. Officers searched the vehicle based on the K-9's positive alert and found in the back pocket of the passenger seat a bindle, some tinfoil, and a small plastic container labeled "AU Jenny Kush by Lume Cannabis Co." that contained a small amount of green leafy substance. Megna asserts that he had no knowledge that those items were in the vehicle. Dkt. No. 52 at ¶¶38, 44-54.

According to Megna, Officer Zak asked him if she minded if she searched him, to which he responded "yes." Megna asserts that he meant, yes, "as in yes I do mind," but he does not assert that he clarified his answer. Captain Musial asserts that he searched Megna's person and found no additional illegal materials. Megna's jacket, which officers had placed on the hood of a police car, was moved into the vehicle to be searched. Officer Zak searched Megna's jacket, in which she found another bindle inside a jacket pocket. Officer Zak then informed Megna, who was sitting unrestrained in the back of a police car to stay warm, that he was under arrest for possession of drug paraphernalia and felony bail jumping. Officers transferred Megna to the Manitowoc County Sheriff's Office. Dkt. No. 52 ¶21, 56-60; Dkt. No. 44 at ¶7; Dkt. No. 55 at ¶14; Dkt. Nos. 42, 43 (video stored in the clerk's office).

Officers conducted a strip search and noted something lodged in Megna's rectal cavity. They transported him to the hospital, where a CT scan revealed a foreign mass that later tested positive for heroin. This resulted in state charges of bail jumping and possession with intent to

deliver, to which Megna entered a no contest plea. Dkt. No. 38 at ¶ 87. He is apparently incarcerated at this moment based on these charges.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc*., 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Megna asserts that Defendants violated the Fourth Amendment when they stopped a vehicle that he was traveling in and searched him without his consent. As an initial matter, Defendants argue that Megna's claims are barred by *Heck v. Humphrey*, which prohibits suits for money damages if the basis for the suit is inconsistent with or would undermine the constitutionality of the conviction or sentence. 512 U.S. 477 (1994). Defendants argue that "[w]ithout the stop, search, and seizure, law enforcement would not have uncovered the heroin

4

[hidden in Megna's rectum] for which Megna was charged and convicted," so, according to Defendants, Megna's "claims implicitly question the validity of Megna's convictions and therefore are barred by the *Heck* doctrine." Dkt. No. 37. Defendants' argument is misplaced.

The Seventh Circuit has explained that "[m]any claims that concern how police conduct searches or arrests are compatible with a conviction. For example, an arrest without probable cause violates the fourth amendment but does not imply the invalidity of a conviction, because courts do not 'suppress the body' of the accused. Similarly, a court's decision not to suppress illegally seized evidence can lead to a conviction without blotting out a § 1983 challenge to the seizure." *Evans v. Poskon*, 603 F.3d 362, 363-64 (7th Cir. 2010) (citations omitted); *see also Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("Even if no conviction could have been obtained in the absence of the violation, the Supreme Court has held that, unlike fair trial claims, Fourth Amendment claims as a group do not necessarily imply the invalidity of a criminal conviction, and so such claims are not suspended under the *Heck* bar to suit.").

Here, Megna is not challenging his conviction for possession of heroin or bail jumping, he merely is seeking some form of damages for the loss of his time and the insult inflicted by an allegedly improper traffic stop and search. *See Mordi v. Zeigler*, 870 F.3d 703, 708 (7th Cir. 2017). Even if he were to prevail on his claims, the later discovery of heroin in his rectum, his no contest plea, and his conviction would not be impacted. Accordingly, Megna's claims are not barred by the *Heck* doctrine.

1. **Defendants are not entitled to summary judgment on Megna's Fourth Amendment claim based on an improper stop.**

Under the Fourth Amendment:

> Traffic stops are seizures, so they must be reasonable under the circumstances. To be reasonable, a traffic stop must be justified at its inception, and reasonably related in scope to the circumstances which justified the interference in the first place. Because traffic stops are typically brief detentions, more akin to *Terry* stops than formal arrests, they

5

require only reasonable suspicion of a traffic violation—not probable cause. By the same token, though, traffic stops must remain limited in scope: A seizure for a traffic violation justifies a police investigation of that violation. Police may not detour from that mission to investigate other criminal activity. A detour that prolongs the stop violates the Fourth Amendment unless the officer has reasonable suspicion to investigate other criminal activity to independently justify prolonging the stop.

*United States v. Cole*, 21 F.4th 421, 427-28 (7th Cir. 2021) (citation and internal quotation marks omitted).

### A. The Stop Cannot be Founded on any Tips

I will begin with the defendants' arguments that the stop here was based on something other than a traffic violation. First, they argue that the City of Manitowoc Police Department received a tip that a tan Ford Explorer entering Manitowoc was involved with drug trafficking. The Defendants are mum about the nature and details of the "tip"—for example, they don't say when police received it, whether it was received by phone or online, or what information it might have supplied about illegal activity. The Defendants do argue that the tip was "corroborated," but they seem to be relying on a bespoke definition of that term. In their view, the tip is "corroborated" because a Lieutenant Albright spotted the tan Ford Explorer driving around Manitowoc. But that is merely corroboration that such a vehicle *exists*—it does not corroborate the salient part of the tip, which is that the vehicle was involved in criminal activity. In sum, the drug tip constitutes the most barebones of anonymous tips, which means this court has no basis by which it could assess whether officers were reasonable in relying on it to make the stop.

The same holds true for the alleged tip that the Explorer was speeding on I-43. As with the drug tip, details remain shrouded in mystery. Instead, the Defendants rest on the fact that, during his questioning after the stop, Megna conceded that the truck had been driving 74 miles per hour on the freeway, which is four miles over the limit. But that's not exactly a smoking gun. When he told police that the truck was driving 74 miles per hour, Megna wasn't conceding a point. Instead,

6

he was protesting that it wouldn't have made sense for someone to phone in a complaint to police when the Explorer was driving roughly the same speed that everyone else drives on the freeway. Thus, the fact that he conceded the truck was going four over the limit does not make it likely that the tip was valid. If anything, it renders the very existence of the tip farfetched. In short, both "tips" are essentially worthless.

Even if the tips were reliable, however, they wouldn't justify the stop *by these officers.* Without expressly stating so, it appears that the Defendants seek to rely on the "collective knowledge doctrine" to support a conclusion that they had reasonable suspicion to stop the vehicle. Under that doctrine, officers "who actually make the arrest need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency." *Tangwall v. Stuckey*, 135 F.3d 510, 517 (7th Cir. 1998). It is well settled that, under those circumstances, "the arrest is proper so long as the knowledge of the officer directing the arrest, or the collective knowledge of the agency he works for, is sufficient to constitute probable cause." *Id.* Thus, under the doctrine, Defendants could stop Megna at the direction of another officer even if they did not have firsthand knowledge of the facts that provided the necessary level of suspicion for the stop.

The fatal flaw is that Defendants—the officers who made the stop—do not assert that any other officer told them about the drug-trafficking or speeding tips. Defendants cannot rely on information known only to other officers to support a finding of reasonable suspicion if that information was unknown to them. *See Reynolds v. Jamison*, 488 F.3d 756, 765 (7th Cir. 2007) ("The fact that an officer later discovers additional evidence unknown to her at the time of the arrest . . . is irrelevant—we only care about what the officer knew at the time the decision was made."). In sum, two dubious tips and an inapplicable doctrine do not justify the stop of the Explorer.

7

### B.  Material Disputes Regarding the Stop as a "Traffic" Stop

Behind door number three is the Defendants' theory that the stop was merely a traffic stop. I first note that the record is not clear which of the two Defendants initiated the traffic stop. In her declaration, Officer Zak asserts that "Captain Musial conducted a traffic stop," a statement that Captain Musial corroborates in his declaration.  Dkt. No. 40 at ¶3; Dkt. No. 44 at ¶5 ("On January 10, 2023, I executed a traffic stop . . .").  But Officer Zak also references "a true and correct copy of [her] report" that she states "is a true and accurate reflection of [her] participation."  Dkt. No. 40 at ¶6.  In her report, Officer Zak asserts that *she*, not Captain Musial, conducted the traffic stop. Dkt. No. 40-1 at 3. And, in an affidavit for a search warrant, which was duly sworn on oath, Detective Schultz (who is not a Defendant) asserted that "on 1/10/23 . . . MTPD Officer Zak completed a traffic stop on a vehicle occupied by Walter J. Megna."  Dkt. No. 40-1 at 20.

In any event, Defendants' theory asserts that the traffic stop was conducted "for violating Wis. Stat. 347.13(3), driving with no registration plate light at night."  Dkt. No. 40 at ¶6; Dkt. No. 44 at ¶5. Driving with no registration plate light sounds simple enough; the problem is that, at the time of the stop, the body cam footage shows that Officer Place explained to Sukowaty that police stopped her truck because the license plate was dirty, not because a plate light was out. Dkt. No. 43, Ex. A at 1:45-2:00. (Although Sukowaty appeared to concede that the plate was dirty, the video does not seem to support that premise.) Thus, there appears to be a dispute even among the defendants as to whether the license plate was dirty, or whether a lamp was out.

Putting that internal dispute aside, Megna's own story is predictably and plausibly different. First, he states that when he asked Officer Zak why the truck was stopped, she responded that she didn't know because "her supervisor initiated the stop." ECF No. 53, ¶ 8. If true—and that would explain why so many patrol cars instantly appeared to assist with a purportedly mundane traffic stop—that would undermine the defendants' claim that they pulled the truck over for a tail

8

lamp infraction that they perceived themselves. Megna also says that while he was standing outside the truck during the search, he noticed that the light on the rear plate was in working order. Dkt. No. 52 at ¶7. Given the defendants' shifting explanations for the stop and Megna's own conflicting version of events, the defendants are not entitled to summary judgment that the stop was warranted as a traffic stop.

In sum, the large number of officers who responded immediately to the stop, as well as the fact that a drug dog was waiting in the wings, makes it apparent that law enforcement was investigating much more than a minor traffic infraction. There's nothing wrong with that, as it is "legally permissible for law enforcement to target, observe, or follow a vehicle that is being surveilled for suspected drug activity and to wait until they observe a traffic infraction so that they can have probable cause to stop the vehicle." *United States v. Radford,* No. 118CR00395TWPDLP4, 2019 WL 6682172, at *3 (S.D. Ind. Dec. 6, 2019). And, because the Fourth Amendment is objective, not subjective, it doesn't matter what their actual purpose in conducting the stop was. *Whren v. United States,* 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis.") So, although it is perfectly common and legal for police to stop a vehicle for a traffic violation when the "real" purpose of the stop is for something else, the problem here is that it is not clear that law enforcement actually observed a legitimate traffic infraction before they stopped the vehicle. A factfinder will have to make that determination, assuming the defendants can agree on what story they want to tell that factfinder.

### C. Captain Musial's Search of Megna

Megna also asserts that his Fourth Amendment rights were violated when he was searched without his consent. No jury could reasonably conclude that Captain Musial violated the Fourth Amendment when he searched Megna's person. First, based on Megna's recounting of his

9

interactions with Officer Zak, the officers' understanding that Megna consented to being searched was reasonable. Megna asserts that, when Officer Zak asked him if he minded if officers searched him, he responded "yes." He explains that he meant "yes, I mind," but his single-word response could also reasonably have been understood to mean "yes, go ahead," particularly because Megna did not clarify his response or object to the search once it was clear that the officers understood that he had consented. *See United States v. Price*, 54 F.3d 342 (7th Cir. 1995); *United States v. Gonzalez-Ruiz*, 794 F.3d 832 (7th Cir. 2015); *United States v. Tomlinson*, 190 F. Supp. 3d 834 (S.D. Ind. 2016).

Furthermore, Officer Bethany Johnson's bodycam video shows Megna consenting to a pat-down search just after the vehicle was stopped and then later consenting to a more thorough search. With regard to the more thorough search, Captain Musial says, "Hey, man, I gotta search you a little better, ok?" To which Megna responds, "Go ahead." During the search, Megna asks Captain Musial, "Would you like me to take my shoes off?" An offer that Captain Musial declines because of the cold. After chuckling while Captain Musial searches his groin area, Megna lightheartedly reassures Captain Musial, "You're good man, you're good." The video leaves no doubt that Megna consented to being pat down and then thoroughly searched, so no jury could reasonably conclude that Captain Musial violated the Fourth Amendment. *See Kailin v. Village of Gurnee*, 77 F.4th 476, 481 (7th Cir. 2023) (video evidence can eviscerate a factual dispute "when the video is so definitive that there could be no reasonable disagreement about what it depicts"); *see U.S. v. Basinski*, 226 F.3d 829, 834 (7th Cir. 2000) ("Because a person may voluntarily waive his Fourth Amendment rights, no warrant is required where the defendant consents to a search."). Officer Musial is therefore entitled to summary judgment on this claim.

### D.  The Search of the Explorer and Jacket

Finally, because the defendants have briefed these issues, I will quickly address the search of the truck and the jacket. The plaintiff's amended complaint and the screening order, as well as his own brief, all focus on the legality of the stop itself—not the subsequent searches of the Explorer or jacket. Accordingly, the searches that occurred after the initial stop are outside the scope of this action. In any event, I will note that the body cam video suggests that the drug dog was already on the scene and did not extend the length of the stop, and so it appears to be a constitutional sniff. *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). With the dog's positive alert, the police then had probable cause to search the vehicle. *United States v. Simon,* 937 F.3d 820, 833 (7th Cir. 2019). As for the jacket, it appears that Megna was arrested based partly on contraband found in the truck itself (i.e., pursuant to a valid search), and so the search of his jacket could have been valid as a search incident to that arrest. *New York v. Belton,* 453 U.S. 454, 460 (1981). But, as stated earlier, these issues have not been raised in this lawsuit.

### CONCLUSION

A material fact exists as to the legality of the "traffic stop" of the Ford Explorer. As such, the motion for summary judgment is **DENIED** as to that claim. It is **GRANTED** as to the search of Megna's person. The court will set this case for a telephonic conference to discuss future scheduling. In the interim, the parties are encouraged to explore settlement. If the parties agree that they are amenable to court-aided mediation, defense counsel should alert the court and it will schedule the case for mediation with another magistrate judge and remove the teleconference from the calendar pending the results of mediation.

Dated in Milwaukee, Wisconsin this 12th day of May, 2025.

STEPHEN C. DRIES
United States Magistrate Judge